```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF WEST VIRGINIA
                            AT CHARLESTON
```

**UNITED STATES OF AMERICA**

v.                                    CRIMINAL ACTION NO. 2:18-00198

**KEITH ALLEN SIZEMORE**


<u>MEMORANDUM OPINION AND ORDER</u>

Upon defendant Keith Allen Sizemore's Motion to Suppress Evidence, filed December 20, 2018, and the memoranda and the documentary evidence filed in connection with the briefing by the parties on the motion and the evidence received at the hearing thereon held on January 8, 2019, the court makes the following findings of fact and conclusions of law.

On July 10, 2017, Detective-Sergeant Shannon R. Morris of the Fayette County, West Virginia, Sheriff's Department, received information from an informant that the defendant, Keith Allen Sizemore, was planning to travel to Detroit, Michigan, for the purpose of acquiring heroin. On July 12, 2017, Sgt. Morris learned that Sizemore was on his way back and alerted others to look for his vehicle as it neared Oak Hill. That same date,

Sgt. T. N. Mooney, the canine handler, observed the defendant driving his pickup truck, in which Melissa Figueroa was a passenger, and noticed that she was not wearing a seat belt. He conducted a traffic stop, along with Sgt. Morris and Sgt. Young.

After a positive alert from the canine, a small quantity of marijuana was found in a duffel bag in the back seat of the vehicle. Figueroa admitted that the marijuana belonged to her. A search of the truck at that point did not result in the discovery of the expected heroin. Sgt. Morris spoke to Figueroa for a couple of minutes at roadside.

The officers obtained a search warrant for the pickup truck and it was towed to the City of Oak Hill service garage where a search took place that same day. No heroin or contraband of any kind was found. Unbeknownst to the officers who had failed to have Figueroa subjected to a search, she had possession of the heroin on her person.

Figueroa was also taken into custody, brought to the Sheriff's office in Fayetteville and interviewed by Sgt. Mooney. At that time she revealed she was in a romantic relationship with the defendant's daughter, Amber Evans. She gave her address as 2081 Prudence Road in Oak Hill. That is the address

where she stayed with her grandmother and which is the residence where she was staying at the time of the case events here. That is the same address set forth on her West Virginia driver's license that was issued earlier that same year in January 2017. Figueroa was released on a citation for both possession of marijuana and no seat belt. The citation reflected her Prudence Road address. She walked from the Sheriff's office to the "four lane" and eventually made her way that same day to the defendant's residence in nearby Oak Hill.

After the fruitless search of the truck, Sgt. Morris, along with two DEA agents, at approximately 9:30 p.m. that evening, traveled to the defendant's residence on Wood Avenue in Oak Hill to discuss the search of the truck. One of them knocked on the door and, when the defendant answered, Sgt. Morris saw Figueroa and Evans inside the residence, but did not speak to them. Rather, Sgt. Morris spoke to Sizemore on the porch but did not enter the house. No further investigation of the matter was undertaken. Sgt. Morris returned the truck to Sizemore the next day.

Nearly two months later, on September 7, 2017, around 5:00 or 5:15 p.m., Sgt. Morris, accompanied by Detective-Sergeant C. A. Young, saw Figueroa at the Dollar Tree parking lot in Oak Hill and observed her hand something to an

3

individual, for which she received money in return that Sgt. Morris saw her stuff in her bra. Figueroa left in a gold Ford Taurus. Sgt. Morris approached the buyer and questioned him about the transaction. He admitted that he had bought $80 worth of heroin from Figueroa and agreed to cooperate with the officers. It was quickly planned that Sgt. Morris and Sgt. Young would meet the buyer at a different location to arrange a second transaction between the buyer and Figueroa that same day. On the way, Sgt. Morris drove by the defendant's residence where he saw the gold Ford Taurus parked on the street in front of the home. Figueroa was not seen by him. The second buy was arranged. Sgt. Morris equipped the buyer with a recording device and pre-recorded money of unstated amount with which to make the buy.

The officers did not know where Figueroa was once she left the 5:15 p.m. transaction. Two hours later, at approximately 7:20 p.m., the officers, who shortly before that time had positioned themselves in sight of the defendant's residence, watched Figueroa come out of the defendant's residence and get in the passenger seat of a Dodge Neon that was parked in the same spot in which the gold Ford Taurus had been parked. The driver was Figueroa's sister, Christine Figeuroa,

and they proceeded to drive to the Dollar Tree parking lot where the controlled transaction took place. After the sale, they observed the Dodge Neon in which Figueroa was a passenger return to the defendant's residence but did not see Figueroa exit the vehicle or enter the residence. The officers met with the informant for a few minutes and then went to the Fayette County Sheriff's Department to draft the warrant for a search of the defendant's house.

In his affidavit in support of the search warrant Sgt. Morris, in the course of noting that he had observed the gold Ford Taurus in front of the defendant's residence soon after the first buy, stated as follows:

> Myself and Detective-Sgt. Young then observed the gold
> Ford Taurus sitting in front of [          ], in Oak
> Hill, WV where we had prior knowledge that Melissa
> Figueroa lived or stayed at.

In reality, neither of those two officers had any such prior knowledge. The affidavit then referred to their prior knowledge a second time:

> Myself and Detective-Sgt. Young then conducted
> surveillance at _____, in Oak Hill, Fayette County,
> WV where we had prior knowledge that Melissa Figueroa
> lived or stayed at.

This was followed by Sgt. Morris' statement in the affidavit that they then witnessed Figueroa come out of the defendant's residence and get into the Dodge Neon to travel to the Dollar Tree parking lot for the second buy, after which he and Sgt. Young followed Figueroa and her sister, who were in the Dodge Neon, back to the location of the defendant's residence. The officers simply made another drive-by. They did not see Figueroa exit that vehicle or enter the residence.

The search warrant was obtained between 8:30 and 9:30 p.m. At 10:00 p.m., or shortly thereafter, the search warrant was executed at defendant's residence. The defendant was home with his son, but neither Figueroa nor Evans was present. Investigators seized 112 grams of heroin, scales, U.S. currency of $2,282.00 and two firearms. No personal belongings of Figueroa's were found during the search. After receiving his <u>Miranda</u> rights, the defendant gave a recorded statement and admitted that the heroin found by the officers was his. He also admitted that he had been purchasing heroin in Detroit for distribution in and around Oak Hill. Defendant told them that he and Figueroa had approximately 80 grams of heroin that officers failed to locate during the previous stop in July.

6

Figueroa had been in a relationship with Evans, now age 27, for nearly eight years. After her release on July 12, 2017, Figueroa went to the defendant's residence but, as she testified, stated that she has never lived there and she has only spent the night there two or three times during their eight-year relationship. As she further testified, she and Evans had stayed at the residence of Evans' mother on Martin Avenue in Oak Hill, and Figueroa also lived in 2017 with her sister, Christine, at Pine Knoll Apartments in Oak Hill. The relationship of Figueroa with Evans ended the next year in 2018.

The affidavit by Sgt. Morris in which he twice claimed that he and Sgt. Young had prior knowledge that Figueroa "lived and stayed at 'the defendant's Wood Avenue address,'" is not supported by the limited observations they had made. Those observations consisted solely of the following:

(1) Figueroa and her then romantic interest, Amber Evans, were seen at the defendant's residence on the evening of July 12, 2017. That is the only time the officers ever saw Figueroa inside the defendant's home.

(2) On September 7, 2017, soon after the first buy, the officers, in a drive by, saw the gold Ford Taurus, in which Figueroa had traveled to conduct the sale, at the defendant's residence.

(3) Two hours later when the second buy took place, the officers saw Figueroa leave the residence and enter her sister's Dodge Neon, driven by her

7

> sister, to conduct the second buy. The officers, in another drive by, followed the Neon back to the defendant's residence, but did not see Figueroa get out of the vehicle or enter the residence.

The officers had no basis whatever from those bare observations to conclude that Figueroa "lived or stayed at" the defendant's residence. The one time that Figueroa was seen inside the residence is the very instance one would expect her to be there. She had just been through a traumatic experience with Sizemore when the two of them were stopped, she was arrested and their vehicle seized. She was released and made her way, initially on foot, to the Sizemore residence where they doubtless wished to talk about their respective plights and the heroin she was still transporting in her bra when she left the police station. It is quite understandable that Amber Evans, who was both her love interest and the daughter of Sizemore, would wish to join them.

In fact, the defendant only stayed overnight in the defendant's residence on two or three occasions in the entirety of her eight year relationship with Amber Evans, but not in 2017. That Figueroa was not living or staying at Sizemore's house on September 7, 2017, is corroborated by the fact that the search of that house two and a half hours after the second sale

showed that neither Figueroa nor any of her belongings were found there. Sgt. Morris' false statement that the officers had prior knowledge that Figueroa "lived or stayed at" the defendant's residence was calculated to mislead the magistrate into the belief that there was probable cause to believe heroin could be found at that location.

Not mentioned in the affidavit is the small amount of heroin involved in the two transactions. The initial drug buy involved the payment of $80 for the heroin sold. The hastily arranged second sale with the same buyer presumably involved a similar amount of heroin having a similar price but, unlike the first buy, the sum paid is not stated. The $80 figure indicates that the heroin sold was but a fraction of a gram. If another fraction of a gram is added for the second sale, the total heroin involved could easily be carried in a pocket or a bra or in one's hand.

It is of note that the affidavit states that "we" had prior knowledge where Figueroa lived or stayed when neither knew that to be true. The use of "we" was designed to fortify the false allegation being made.

At the time the affidavit was presented to the magistrate, neither Sgt. Morris nor Sgt. Young knew from whence Figueroa had come when she made the first sale at Dollar Tree. She was driving Amber Evans' gold Ford Taurus because Figueroa's vehicle was in a shop for repair. So it is, that the officers knew only that Figueroa left the Sizemore residence in her sister Christine's Dodge Neon and traveled to the Dollar Tree parking lot to close a second sale. From that point, the officers knew only that the vehicle was driven back to the Sizemore residence, but they did not know whether Figueroa entered the residence. What they would learn some two and a half hours later when the search warrant was executed, was that Figueroa was not there and neither were any of her belongings. And they would seize cash money in the amount of $2,282.00 but did not identify any of it as being the prerecorded money supplied by the officers for the second buy.

The sole supporting basis for the affidavit turns on the sale of a meager amount of heroin by one who, in the course of making the sale, has paid a visit to the home of another. Armed only with that limited circumstance, Sgt. Morris sought a search warrant of the place visited by the small time dealer. Doubtless recognizing the weakness of the premise for a search

of the home, Sgt. Morris added the following unsubstantiated paragraph:

> Members of the Central West Virginia Drug have received numerous complaints about the sale and distribution of Heroin from this residence. Members of the Task Force have received numerous complaints about other subjects who are known to live or stay at the residence described. Those subjects are Keith Sizemore and Amber Evans.

Unnamed members of the Central West Virginia Drug and Violent Crime Task Force are thus alleged by Sgt. Morris to have received numerous undesignated complaints about the sale and distribution of heroin from the Sizemore residence. There is not an iota of evidence to support that gratuitous allegation. As if that were not enough, it is further alleged that undesignated members of the Task Force have received numerous undesignated complaints about Keith Sizemore and Amber Evans who are known to live or stay at the Sizemore residence. That too, is alleged without a whit of evidence. What is known is that the Task Force had never made a controlled buy from that residence.

It is further noted that, just as Figueroa was falsely stated by Sgt. Morris to have lived or stayed at the Sizemore residence, so too is the unproved allegation that Amber Evans lived or stayed there. She did not. Sgt. Morris has since

11

admitted that he did not know where Evans lived or stayed and, as with Figueroa, he had made no investigation to find out. Rather, he simply saw Evans there on the evening of July 12th and made the same unwarranted assumption about Evans as he had made about Figueroa.

While the court must give deference to the sworn statement of the officer seeking a search warrant, the warrant must be supported by substantial evidence from reliable sources and there must be a fair probability that the contraband or related incriminating evidence will be found. Here, the only disclosed prior criminal activity of the target Figueroa was her mere possession of a small quantity of marijuana two months earlier along with the seat belt violation. Under a totality of the circumstances analysis, the only facts of which Sgt. Morris had knowledge that were in any sense relevant to the issuance of the search warrant sought, were the two small-time sales in the Dollar Tree parking lot. Only one of those sales significantly related, however obscurely, to the Sizemore house in that the officers witnessed Figueroa leave from that point while on her way to make the second sale. In particular, without the false statement that Figueroa lived or stayed at the Sizemore house, coupled with the false statement that the officers had prior

knowledge of that allegation, there was simply no adequate ground on which to base the search of another man's home.

The defendant was the sole owner of the residence searched. It was his home, as well as that of his 16-year-old son, and he had a legitimate expectation of privacy in it. The search warrant obtained for his residence was sought without any basis for it, and its execution was a clear violation of the Fourth Amendment to the United States Constitution as an unreasonable search and seizure.

Within an hour of the execution of the search warrant and seizure from the defendant's home of the heroin, scales, $2,282.00 in currency and the two firearms, he was taken to the Fayette County Sheriff's Department for a recorded interview. After receipt of <u>Miranda</u> warnings, the defendant made a complete confession that included his responsibility for that which was seized, as well as prior illicit drug activities. The defendant's statement was closely connected with and a direct result of the illegal raid on his home.

**As a consequence, the Motion to Suppress Evidence is granted as to the evidence seized from the defendant's home, as well as the defendant's confession that soon followed that same evening.**

**The Clerk is directed to forward copies of this order to the defendant and all counsel of record.**

**DATED: March 1, 2019**

_____
John T. Copenhaver, Jr.
Senior United States District Judge